# In the United States Court of Federal Claims

No. 22-1811
Filed: June 8, 2023[†]

---

**THALIN, LLC,**

    *Plaintiff,*

v.

**THE UNITED STATES,**

    *Defendant,*

and

**FURY SOLUTIONS, LLC,**

    *Intervenor-Defendant.*

---

*Jon D. Levin,* with *W. Brad English, Emily J. Chancey, Joshua B. Duvall,* and *Nicholas P. Greer*, Maynard, Cooper & Gale, P.C., Huntsville, Alabama, for Plaintiff.

*Ebonie I. Branch*, Trial Attorney, with *Douglas K. Mickle*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., *Aaron J. Weaver*, Trial Attorney, AF/JACQ Contract Litigation, U.S. Air Force, for Defendant.

*Suzanne Sumner*, with *Barbara A. Duncombe, Brandon E. Dobyns,* and *Erin R. Davis*, Taft Stettinius & Hollister LLP, Dayton, Ohio, for Intervenor-Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    In negotiated procurements, disappointed offerors face an uphill battle to show an agency acted arbitrarily or capriciously. Even if a disappointed offeror can show a flawed evaluation or failure to properly document a decision, the disappointed offeror must also show it was

---

[†] This Order was originally filed under seal on May 24, 2023, (ECF No. 41). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. Only Defendant filed proposed redactions on June 7, 2023, (ECF No. 43); they are accepted by the Court. Thus, the sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

prejudiced by the agency's conduct. Due to the discretion afforded to contracting officers, this can be a nearly insurmountable hurdle when the agency makes a best value determination.

This bid protest considers whether the United States Air Force ("Air Force") erred when it awarded Fury Solutions, LLC ("Fury") the "Multilateral Administrative Requirements Vehicle" ("MARVel") contract providing office administrative services for the Phillips Research Site ("PRS") at Kirtland Air Force Base in New Mexico; this facility houses the Air Force Research Laboratory Space Vehicles and Directed Energy Directorates. Thalin, LLC ("Thalin"), a disappointed offeror, challenges the United States on three main issues: (1) whether the Air Force misevaluated offerors' past performance; (2) whether the Air Force failed to comply with the Solicitation's evaluation criteria regarding Thalin's staffing approach; and (3) whether the Source Selection Authority's ("SSA") trade-off analysis was irrational. Thalin seeks declaratory relief providing that the Air Force's award lacks a rational basis and is otherwise unreasonable, arbitrary and capricious, and contrary to applicable law and regulation. Lastly, Thalin requests a permanent injunction requiring that Fury cease performance and the Air Force to reevaluate proposals.

The Court determines that despite some documentation failures, the Air Force reasonably reviewed proposals and determined its award decision based on a best value tradeoff. Accordingly, the Court denies Thalin's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 34), and grants the United States' and Fury's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 36; Int.-Def.'s xMJAR, ECF No. 35).

## I. Background

The procurement involves an 8(a) set-aside Indefinite Duration Indefinite Quantity ("IDIQ") contract for administrative and data entry support at PRS. (Administrative Record "AR" 1, ECF No. 28-1).[1] The Solicitation's[2] Performance Work Statement ("PWS") defined the scope of work:

> The objective of this acquisition is to obtain Non-Personal, Non-Advisory and Assistance (A&AS) Services in response to Task Orders (TO) issued by the Contracting Officer (CO) for management, business and administrative services. These services are to support the Phillips Research Site (PRS) management and operations at various organizational levels to include Air Force Research Laboratory (AFRL) Space Vehicles (RV) and AFRL Directed Energy (RD) Directorates, AFRL geographically separated units or locations with an AFRL/RD or RV mission and their technical and functional

---

[1] Citations to the record in this opinion are from the Administrative Record, (ECF No. 28-1). These citations refer to the appendix paginations within these documents as filed with the Court and do not correspond with the ECF-assigned page number on which the appendix appears. Thus, the Court will cite to the record using "(AR __)."

[2] Request for Proposal No. FA945122RA002.

2

divisions, the business offices within the divisions, as well as the Atomic Long Range Systems office and other individual projects, branches and divisions. Work under this Indefinite Delivery/Indefinite Quantity (IDIQ) will be authorized and more specifically defined in individual Task Orders executed by the Contracting Officer.

(AR 43).

The Solicitation stated the Air Force would make a single award based on a best value tradeoff. (AR 937). It explained that the Air Force would evaluate the value of proposals based on three factors: Technical, Past Performance, and Price. (AR 937–38). The Solicitation stated that "Technical is more important than Past Performance or Price" and "Past Performance is more important than Price." (AR 938).

The Solicitation further stated that evaluation of the Technical Factor should also consider risk "separately or in conjunction with technical factors[.]" (*Id.*). Factor 1—Technical/Risk—would consist of two subfactors: Program Management Approach and Staffing Approach. (*Id.*). Subfactor 1, the Program Management Approach, evaluated whether an offeror's proposal included plans for quality control, communication, and transition, as well as provided a "realistic and effective approach to [applicable] PWS requirements." (*Id.*). The Air Force assigned Subfactor 1 an adjectival rating of either Acceptable or Unacceptable based on whether the offeror met the requirements of the Solicitation:

| Adjectival Rating | Description |
|---|---|
| Acceptable | Proposal meets the requirements of the solicitation. |
| Unacceptable | Proposal does not meet the requirements of the solicitation. |

(AR 938–39).

Subfactor 2, Staffing Approach ("Subfactor 2"), evaluated whether an offeror's proposal provided a plan that ensured properly skilled and trained personnel. (AR 939). Specifically, the Solicitation sought a plan that included "the offeror's ability to timely hire sufficient personnel to perform the PWS, and to deliver seamless continuity of services without interruption or degradation of services." (*Id.*). The Air Force assigned Subfactor 2 "Technical/Risk Ratings" ranging from Unacceptable to Outstanding based on the clarity, comprehensiveness, realistic, and efficiency of the approach:

| Color Rating | Adjectival Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |

| | | |
|---|---|---|
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

(AR 939).

Factor 2—Past Performance—assessed the Air Force's confidence in an offeror's ability to meet the Government's needs based on its performance record. (AR 940). Proposals were evaluated on "each [o]fferor's demonstrated recent and relevant record of performance of services that are like the solicitation requirements and the quality of the [o]fferor's performance record." (*Id.*). Such records of performance included "partners to the joint venture in the aggregate[.]" Recency was defined as at least twelve months of effort performed within three years of February 24, 2022, when the Solicitation was issued. (*Id.*). "Recency for Protégé" was defined as at least six months of effort performed within six years from the Solicitation's issuance date. (*Id.*). Relevancy was determined by "the similarity to the scope, magnitude of effort and complexity of the [o]fferor's performance." (*Id.*). The Air Force assigned Adjectival Ratings for Relevancy based on present and past performance efforts ranging from Not Relevant to Very Relevant:

| Adjectival Rating | Description |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

(AR 941). The Air Force also assigned Confidence Ratings[3] based on the United States' belief an offeror could successfully perform the Solicitation's requirements:

| Rating | Description |
| --- | --- |
| Substantial Confidence | Based on the Offeror's recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available, or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| No Confidence | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |

(AR 942).

Factor 3—Price Evaluation—was ranked by "Total Evaluated Price" which assessed the cumulative value of each contract line item for each task order, including the Solicitation's base period and options. (AR 942). The offer's reasonableness was determined by adequate price competition. (*Id.*).

The Air Force evaluated each offeror's proposals on these factors and subfactors. (AR 3188). For Subfactor 1 involving program management, Fury and Thalin both received Acceptable ratings. (*Id.*). For Subfactor 2's staffing approach, Fury received a Good rating while Thalin received an Acceptable rating. (*Id.*). The Air Force's two initial evaluators assigned Fury seven strengths and two weaknesses, and four strengths and five weaknesses with three noted deficiencies and other notes. (AR 2764–65, 2769). The Source Selection Evaluation Board ("SSEB") assigned Fury six strengths and only one weakness, resulting in a Good rating. (AR 3144). Regarding Thalin's evaluation under Subfactor 2, the Air Force initially assigned it three strengths and four weaknesses, and three strengths and three weaknesses, respectively. (AR

---

[3] The Solicitation provided that if an offeror did not have a record of relevant past performance or lacked sufficient information on past performance, the offeror would not be evaluated favorably or unfavorably; such a lack of performance record would be considered "Neutral." (AR 942).

2810–11, 2815). However, the SSEB assigned Thalin four strengths and no weaknesses. (AR 3153). Thalin's rating for Subfactor 2 remained Acceptable. (*Id.*).

For Factor 2, Fury received a Substantial rating while Thalin received Satisfactory. (AR 3188). The Air Force identified three indicators of Fury's positive past performance, including Relevant and Very Relevant former contracts. (AR 3166). The Air Force did not find any negative or adverse performance from Fury. (*Id.*). For Thalin, the Air Force identified one positive performance from its mentor, Beshenich Muir & Associates, LLC ("BMA"), that was considered Very Relevant. (AR 3172–73). The Air Force did not find any negative or adverse performance from Thalin. (AR 3173). The Air Force summarized the relevant evaluations in the following chart:

| Offeror | Technical-SF1 Program Mgmt. | Technical-SF2 Staffing | Past Performance | Price | Reasonable Realistic Balanced |
|---|---|---|---|---|---|
| Fury Solutions JV | Acceptable | Good | Substantial | $41,108,123 | Yes |
| Thalin, LLC | Acceptable | Acceptable | Satisfactory |  | Yes |

(AR 3188). The Agency also noted that all offerors' price proposals were, reasonable, realistic, and balanced. (*Id.*).

Following the evaluation of proposals, the Air Force Contracting Officer ("CO") determined that Fury's proposal offered the best overall value and referred the selection to the Small Business Administration ("SBA"). (AR 3288). Although the CO found Thalin's proposal reasonable, it was not as highly rated as the proposal from Fury. (AR 3188). The SBA determined that Fury was eligible for the award and authorized the Air Force to contract with Fury. (AR 3290–91). The Air Force formally awarded the contract to Fury on November 14, 2022. (AR 3313). Thalin filed its Complaint with this Court on December 12, 2022. (Compl., ECF No. 1).

## II. Analysis

The Tucker Act establishes this Court's jurisdiction to hear bid protests. 28 U.S.C. § 1491(b). When deciding a bid protest, the Court "appl[ies] the appropriate [Administrative Procedure Act ("APA")] standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Under the APA standard, the Court determines whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004), *aff'g* 56 Fed. Cl. 377 (2003) (internal citations omitted). "The court's task is to determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).

To determine whether the agency's decision was arbitrary or capricious, the Court should determine whether it was "legally permissible, reasonable, and supported by the facts[,]" rather

than substitute in its own judgment. *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 551 (2017); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (requiring agency to consider an important aspect of the problem, explain its decision so it conforms to the evidence before the agency, or plausibly ascribe difference in view based on agency expertise). The standard of review is "highly deferential[.]" *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). "Procurement officials have substantial discretion to determine which proposal represents the best value for the government" particularly in the "minutiae of the procurement process[.]" *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). However, if the agency's conduct fails under this standard, the Court must determine if the "bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). To establish prejudice, the plaintiff must show "that there was a 'substantial chance' it would have received the contract award but for the [agency's] errors." *Id.* at 1353.

When the parties move for judgment on the administrative record, RCFC 52.1 provides a procedure to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc.*, 404 F.3d at 1356. Genuine issues of material fact do not preclude judgment on the administrative record and so, the Court can resolve questions of fact by referencing the administrative record. *Id.* at 1355–56. The Court is bound to the administrative record and "will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated . . . ." *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 764 (2022) (quoting *IAP Worldwide Servs.,* 159 Fed. Cl. 265, 286 (2022)). The Court must be careful regarding "any rationale that departs from the rationale provided at the time the procuring agency made its decision." *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015)), *aff'd* 809 F.3d 590 (Fed. Cir. 2015)).

Thalin challenges the United States on three primary grounds. First, Thalin argues that the Air Force conducted a flawed evaluation of its past performance, ignoring information about its mentor, BMA. (Pl.'s MJAR at 21–25). Second, Thalin argues that the Air Force failed to consider and apply proper adjectival ratings to its staffing approach. (*Id.* at 25–30). Third, Thalin argues the source selection decision lacked a rational basis because the underlying evaluations and ratings were flawed. (*Id.* at 30–37). The United States counters that the Air Force properly evaluated Thalin's past performance, assigned Thalin's staffing approach appropriate adjectival ratings, and that the SSA properly considered and documented Thalin and Fury's proposals. (Def.'s xMJAR at 13–31). Fury similarly argues the Air Force reasonably evaluated Thalin's proposal under Factor 1 and Subfactor 2, and the SSA's trade-off analysis was rational. (Int.-Def.'s xMJAR at 7–18). The Court agrees with the United States and Fury.

### A.  *The Air Force's evaluation of Thalin's proposal under Factor 2 was not flawed.*

Thalin argues that the Air Force engaged in a flawed evaluation of Factor 2—Past Performance. (Pl.'s MJAR at 21–25). Specifically, Thalin contends that the Air Force arbitrarily ignored its mentor's relevant past performance when Thalin provided the information in a different subsection of the proposal. (*Id.* at 21–22). Thalin further argues that the Air Force "obviously read Thalin's past performance" information but ignored details and regulations regarding percentages of work share among Thalin and its joint venturers. (*Id*. at 23–24 (citing

7

13 C.F.R. § 125.8(c)(1))). Thalin concludes that the Air Force's error was prejudicial, and if properly evaluated, Thalin would have received the only "Very Relevant" rating. (*Id.* at 24–25).

The United States counters that the Air Force properly evaluated Thalin's past performance because Thalin failed to comply with Solicitation instructions. (Def.'s xMJAR at 22–27). First, the United States argues Thalin's proposal contained a material omission when it failed to adequately describe the role each joint venture partner would perform as well as the specific percentage and type of work for each partner as required by the Solicitation. (*Id.* at 23). To show Thalin's deficiencies, the United States differentiates Thalin's proposal with Fury's, which "fully complied" with the Solicitation's requirements. (*Id.* at 26–27). Second, the United States argues Thalin's reliance on a regulation regarding the breakdown of work share is misplaced because it establishes a minimum threshold but not the requisite specifics. (*Id.* at 27). For its part, Fury notes that the Solicitation "distinctly required the offeror to delineate the role each subcontractor, teaming partner and joint venture partner as well as the percentage and type of work each would perform[.]" (Int.-Def.'s xMJAR at 11 (citing AR 963)). Fury argues the Solicitation clearly required such details in each offeror's proposal, but that Thalin omitted "any specific breakdown." (*Id.* at 12). The United States' and Fury's arguments are persuasive while Thalin's are not.

The Air Force is required to evaluate all proposals according to the terms and conditions of the Solicitation. *See* FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). In turn, offerors are required to "conform to the material terms and conditions of the solicitation[.]" *Allied Tech. Grp., Inc. v. United States*, 649 F3d 1320, 1329 (Fed. Cir. 2011) (quoting *E.W. Bliss Co.*, 77 F.3d at 448). Any deviating proposal "should be considered unacceptable and a contract award based on such an unacceptable proposal [would] violate[] the procurement statute and regulations." *Id.* In other words, a proposal must adequately respond to material requirements in the solicitation. *See Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037–38 (Fed. Cir. 2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals.").

A material solicitation requirement (1) is express in the solicitation, and (2) serves a "substantive purpose." *Digiflight, Inc. v. United States*, 150 Fed. Cl. 650, 657 (2020) (internal citations omitted), *appeal dismissed*, No. 2021-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021). "A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 506–07 (2019) (collecting cases). This Court has held that "[a] proposal's failure to satisfy a material . . . solicitation requirement is a material error." *Digiflight, Inc.*, 150 Fed. Cl. at 657.

Under Factor 2, the Solicitation expressly required offerors to describe the role of each joint venture partner and provide a percentage breakdown of the type of work each partner would perform. (AR 963–64). For example, Paragraph 6.1.1., Attachment 22, required offerors to "describe the role of the [o]fferor and each subcontractor, teaming partner, and/or joint venture partner for whom the [o]fferor is electing to provide Past Performance[,]" noting that "[t]he Summary Page *shall also indicate the percentage and type of work the [o]fferor and contractor,*

*joint venture, partner, affiliate, subcontractor, etc. will perform.*" (AR 963) (emphasis added). The Solicitation also included a Performance Information ("PI") Worksheet for offerors to provide brief descriptions regarding past performance. (AR 853–56). Section G of the PI Worksheet required offerors to:

> Describe the nature or part of the work on the proposed effort to be performed by the business entity being reported here. Also, *estimate the percentage of the total proposed effort to be performed by this entity* and whether this entity will be performing as the prime, subcontractor, or corporate division.

(AR 856) (emphasis added). Both requirements are material because they were included to help the Air Force understand which business entity will perform specific proportions of the work. In the SSEB's report, the Board included each offeror's percentage breakdowns, if provided, to explain its recency and relevancy determinations. (AR 3157–59). As such, the percentage breakdowns were integral to the Air Force's evaluation and had more than a negligible impact on a proposal's quality. *See ManTech Advanced Sys. Int'l, Inc.*, 141 Fed. Cl. at 506–07.

In its proposal, Thalin committed a material error when it failed to provide a full percentage breakdown as required by Factor 2.[4] (AR 2226, 2230, 2234); *see Digiflight, Inc.*, 150 Fed. Cl. at 657. On its Summary Page, Thalin stated that as a prime contractor it would "perform no less than 90% of the work[.]" (AR 2226). It also provided that "Subcontractor Arctos will perform up to 20% of the work 90% of the work on the MARVel Contract[.]" (*Id.*). However, it did not provide similar percentage breakdowns for its mentor, BMA, and its protégé, Lunatek LLC ("Lunatek"), on the Summary Page. (*Id.*). This absence was noted by the SSEB in its report. (AR 3159 (listing "Prime: Thalin (90%), Mentor: [BMA], Protégé: [Lunatek][;] Subcontractor: Arcos (up to 20%)")).

Thalin also did not provide a specific percentage breakdown for BMA's performance in response to Section G on the PI Worksheet. (AR 2234). As an initial matter, Thalin responded to the Section G prompt under the mislabeled Section I. (*Id.*).[5] Thalin argues that the duty "to write a well-organized proposal" has its limits and that the Air Force ignored information "in a heading half a page down from where the Agency wanted it." (Pl.'s MJAR at 23). This is unavailing. Notwithstanding that scrivener's error, Thalin's response itself was insufficient. Specifically, it did not detail BMA's proposed effort or provide a percentage breakdown, (AR 2233); instead, it provided that "BMA is the Mentor Company Partner in [Thalin]. [Thalin] will perform the preponderance of the work – no less than 80% aggregately." (AR 2234). This response merely provides an aggregate, not a specific breakdown of each entity's proposed performance.

---

[4] The Solicitation cautioned offerors that a "proposal must include all information requested and must be submitted in accordance with these instructions. Compliance with these instructions is mandatory[.]" (AR 2702).

[5] Section I does not exist on the Air Force's Worksheet. (AR 2234).

9

Thalin's omissions plainly contravene its argument that the Air Force ignored or failed to read BMA's past performance submission. (Pl.'s MJAR at 23). In its proposal, Thalin did not provide what percentage of the work BMA would complete, as requested. (AR 2226, 2230, 2234). The Federal Circuit distinguishes such omissions from de minimis errors "that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). The Air Force specifically requested the breakdown to understand each entity's proposed respective involvement and Thalin failed to satisfy that material requirement. Thalin's omission was even noted in the SSEB report, which states that "[t]he Past Performance Team identified one BMA (mentor) contract that was considered 'Very Relevant' to MARVel however there is no indication of the percentage of work performance as required by the solicitation." (AR 3172–73). Without Thalin's proposed percentage breakdown, the Air Force was left to speculate what percentage of the work share would be performed by the protégé and mentor. Therefore, Thalin committed a material error when it omitted a percentage breakdown of BMA's performance and the Air Force properly evaluated Thalin's past performance.

Furthermore, Thalin improperly relies on 13 C.F.R. § 125.8 to support its argument that the Air Force ignored a legally imposed percentage breakdown between mentors and protégés. (Pl.'s MJAR at 24). "When interpreting regulations, we apply the same interpretive rules we use when analyzing the language of a statute." *Boeing Co. v. Sec'y of Air Force*, 983 F.3d 1321, 1327 (Fed. Cir. 2020) (citing *Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015)). It is well established that the Court must, wherever possible, "giv[e] effect to the plain meaning of each word, clause or sentence." *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 67 (2011) (internal citations omitted). Section 125.8(c)(1) provides that a protégé must perform at least 40% of the work while the mentor performs the rest. Thalin argues the Air Force "ignored the law" and that "BMA's level of effort would have been up to 60%" because it was the mentor. (Pl.'s MJAR at 24; Pl.'s Reply at 6, ECF No. 37). However, this ignores the plain language of the regulation.

Section 125.8 provides "[w]hat requirements must a joint venture satisfy to submit an offer or a procurement or sale set aside or reserved small business[.]" Subsection § 125.8(c)(1) specifically requires that:

> [A]ny contract set aside or reserved for small business that is to be performed by a joint venture between a small business protégé and its SBA–approved mentor authorized by § 125.9, the joint venture must perform the applicable percentage of work required by § 125.6, and the small business partner to the joint venture *must perform at least 40% of the work* performed by the joint venture.

13 C.F.R. § 125.8(c)(1) (emphasis added). This language does not create rigid requirements wherein the protégé performs 40% of the work and the mentor performs the remaining 60%, as argued by Thalin. (Pl.'s MJAR at 24). Rather, it merely indicates a minimum threshold for the protégé's performance of work. *See Framaco Int'l, Inc. v. United States*, 119 Fed. Cl. 311, 317, 323 (2014) (understanding "at least" to indicate a minimum threshold). Therefore, it was rational for the Air Force to not apply a "legally imposed percentage" to Thalin's past performance. This

deficiency was significant. Accordingly, the Air Force properly evaluated Thalin's proposal under Factor 2 and did not act arbitrarily or capriciously.

> B. *The Air Force's evaluation of Thalin's proposal under Subfactor 2 complied with the Solicitation.*

Thalin argues that the Air Force departed from the Solicitation's evaluation criteria under Subfactor 2. (Pl.'s MJAR at 26–30). Specifically, Thalin claims its final adjectival rating should have reflected the SSEB's removal of any weaknesses found by initial evaluators under Subfactor 2. (*Id.* at 26). Thalin highlights that other offerors' ratings favorably increased once the SSEB removed their weaknesses, however, Thalin's rating remained Acceptable despite having four strengths and zero weaknesses. (*Id.* at 26–28). Thalin argues the SSEB treated it unequally because it did not reconsider its adjectival rating and did not adequately document its rating decision. (*Id.* at 27–29).[6]

The United States counters that the Air Force's evaluation was consistent with the Solicitation's qualitative criteria and properly documented. (Def.'s xMJAR at 27–34). The United States argues the Air Force exercised its discretion to determine that Thalin's proposed staffing approach warranted an Acceptable rating. (*Id.* at 29 (citing AR 3123)). The United States also notes that Thalin fails to explain why this rating was unreasonable and the result of unequal treatment. (*Id.* at 30–31). Further, the United States argues the SSEB was not required to change Thalin's adjectival rating, and that it adequately documented its evaluation process. (*Id.* at 32–33). Similarly, Fury argues Thalin fails to establish that it was treated unequally because "not all strengths or weaknesses are the same[,]" so evaluators must exercise discretion when evaluating proposals. (Int.-Def.'s xMJAR at 15–18). The Court agrees with Thalin that the SSEB did not properly document its Acceptable rating but determines the failure did not prejudice Thalin and Thalin was not subject to unequal treatment.

> i. *The SSEB failed to properly document its evaluation of Thalin's proposal under Subfactor 2, but Thalin was not prejudiced by the failure.*

It is well-established that "[t]he [C]ourt should not substitute its judgment for that of a procuring agency." *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). "The deference afforded to an agency's decision must be even greater when a trial c ourt is asked to review a technical evaluation[,]" *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008), because procurement officials exercise broad discretion to determine whether a proposal warrants strengths or weaknesses. *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 386 (2017); *E.W. Bliss Co.*, 77 F.3d at 449 (technical evaluations are the "minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess[.]"). However, the Court's role is to determine whether the officials evaluated the proposals and explained a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck*

---

[6] Thalin also argues the SSA did not conduct an independent review of Subfactor 2's rating, however, Thalin discusses the argument in detail below in the next section of its brief. (*Id.* at 29–37). The Court will also address this issue in more detail below.

*Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Therefore, to successfully challenge a best value determination, a protestor must offer more than its own disagreement with the agency's assessment of different proposals and must also establish it was prejudiced by the agency's conduct. *Banknote Corp. of Am., Inc.*, 56 Fed. Cl. at 384; *Bannum, Inc.*, 404 F.3d at 1353.

Under Subfactor 2, the Air Force used two technical evaluators and then the SSEB to rate and find strengths and/or weaknesses for each proposal. (AR 391–92). Technical evaluators rated Thalin's proposal as Acceptable, with three strengths and four weaknesses and three strengths and three weaknesses, respectively. (AR 2810–11, 2815). The SSEB left Thalin's Acceptable rating intact but assigned it four strengths and zero weaknesses. (AR 3153). The SSEB explained Thalin's four strengths, including that Thalin's recruiting methods were "solid and varied" and it "put some thought into [training] areas of the PWS[.]" (*Id.*). However, the SSEB did not explain why Thalin's rating remained an Acceptable. (*Id.*). Instead, it merely stated "[s]taffing approach had several strengths and no weaknesses[;] Thalin's overall Subfactor 2 rating was acceptable[]" and reiterated what constitutes an Acceptable rating. (*Id.*). Comparatively, the SSEB explained that under Subfactor 2, Fury's proposal "provides a solid plan for staffing the contract," warranting a Good rating. (AR 3144). The difference in explanation undermines the United States' argument that the SSEB provided a "sufficient record" for the Court. (Def.'s xMJAR at 33). Other offerors, like Fury, received rating explanations while Thalin did not. (AR 3144, 3153). The SSEB failed to articulate a reasonable and coherent rationale for Thalin's Acceptable rating as it did for other offerors.

Nonetheless, Thalin fails to show it was prejudiced by the failure to document its evaluation under Subfactor 2. (Pl.'s MJAR at 29–30). To show prejudice, the plaintiff must demonstrate it had a "substantial chance" of receiving the contract "but for" the agency's errors. *Bannum, Inc.*, 404 F.3d at 1353. Importantly, "[a] protestor's burden is higher for a negotiated procurement because the contracting officer has broad discretion when engaging in an inherently judgmental process." *Galen Medical Associates, Inc. v. United States*, 369 F.3d 1324, 1331 (2004) (internal citation omitted).

Thalin fails to establish that but for this error, Thalin had a substantial chance of award. (Pl.'s MJAR at 29). Specifically, Thalin argues the SSA improperly relied on the SSEB's rating to award Fury the contract. (*Id.* at 29–30). But Thalin overlooks the SSA's own determination that "Fury's strengths, consistent with Fury's higher rating, were more significant as compared to Thalin's." (AR 3286). The SSA explicitly compared Fury and Thalin's employee retention strategies, noting Fury's "indicates a significant advantage with respect to the retention of incumbent employees and demonstrated a high monthly retention rate" whereas Thalin's "did not clearly address their approach to retaining current employees[.]" (*Id.*). Such language indicates that the SSA exercised independent judgment and rationally determined Fury warranted a Good rating while Thalin warranted an Acceptable rating. Again, Thalin merely disagrees with the Air Force's evaluation. (Pl.'s MJAR at 27–28).

Thalin also argues that Fury's offer was ▮▮▮▮▮ higher than Thalin's, so it would have stood a substantial chance of award. (*Id.* at 29–30). This is unavailing. As stated above, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government[.]" *E.W. Bliss Co.*, 77 F.3d at 449. The Air Force determined

12

Fury's proposal provided the best value to the United States, even with its higher price. Accordingly, the Court will not second guess the Air Force's best value determination and determines Thalin was not prejudiced by the documentation failure.

        ii. *The Air Force did not treat Thalin's proposal unequally under Subfactor 2.*

Even if Thalin could show prejudice from the SSEB's failure to document, it cannot adequately show unequal treatment. Thalin unconvincingly argues it suffered unequal treatment because its rating remained Acceptable, while others' ratings were increased after the SSEB removed weaknesses. (Pl.'s MJAR at 27). The record contains no indication that Thalin's Acceptable rating was the result of unequal treatment. (*See generally* AR). It is true that Fury initially received both a Good and an Acceptable rating by the technical evaluators, and a Good rating by the SSEB once all but one of Fury's weaknesses were removed. (AR 2764–65, 2769). However, weakness removal does not automatically warrant an increased rating. The Solicitation did not provide that an exact number of strengths or weaknesses would result in a specific rating, (AR 939); *see also Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (finding that unequal treatment must entail inconsistent application of an "objective solicitation requirement").[7] Instead, it provides that the rating system was qualitative not quantitative, and subject to agency discretion. (*Id.*). Thalin fails to provide more than a mere disagreement with the Air Force's Subfactor 2 ratings. Accordingly, the SSEB failed to properly document its evaluation of Thalin's proposal under Subfactor 2, but Thalin was not prejudiced by the failure nor the target of unequal treatment.

    C. *The Air Force's Source Selection Decision was rational.*

Thalin argues the source selection decision was arbitrary, irrational, and contrary to law because the SSA relied on evaluation errors in her trade-offer analysis. (Pl.'s MJAR at 30–36). Specifically, Thalin argues the SSA: (1) relied on an irrational rating for Subfactor 2 and "continued to ignore Thalin's [p]ast [p]erformance submission[;]" (2) assigned a factually incorrect weakness to its staffing approach; and (3) failed to properly consider the strengths of Thalin's and weaknesses of Fury's proposals. (*Id.*). Thalin concludes it was prejudiced by these three errors. (*Id.* at 36–37).

The United States responds that the SSA did not adopt the SSEB's errors and properly considered and documented Thalin and Fury's proposals. (Def.'s xMJAR at 34–41). First, the United States argues the SSA properly considered the SSEB's evaluation of Thalin's proposal and its underlying merits. (*Id.* at 35). Second, the United States argues the SSA identified higher staffing risk in Thalin's proposal compared to Fury's proposal consistent with the Solicitation. (*Id.* at 36–39). Third, the United States argues the SSA properly compared Thalin's and Fury's proposals in its tradeoff analysis. (*Id.* at 39–41). For its part, Fury argues the SSA's best value

---

[7] The only language regarding number of strengths and weaknesses is that Unacceptable ratings "contain[] one or more deficiencies," Good ratings "contain[] at least one strength," and Outstanding ratings "contain[] multiple strengths[.]" (AR 939).

determination was rational, well-documented, and in accordance with the law. (Int.-Def.'s xMJAR at 18–21). The Court is persuaded by the United States and Fury.

It is correct that the SSA must exercise independent judgment when making a source selection decision. (Pl.'s MJAR at 30 (citing FAR 15.308) (permitting the SSA to "use reports and analyses prepared by others," but requiring "the SSA's independent judgment.")). Here, there is ample evidence that the SSA exercised her independent judgment to determine Fury's proposal offered the best value to the Air Force. For example, the SSA documented that the SSEB found—and her own analysis supported—that Thalin's proposal created a "difficulty in determining the roles BMA and Lunatek would each perform on the MARVel effort[,]" warranting a Satisfactory rating. (AR 3282–83). In stark contrast, Fury's past performance "clearly" showed performance confidence and recent, relevant performances. (AR 3283–84). Under Subfactor 2 as discussed above, the SSA explicitly compared Thalin and Fury's staffing approaches, concluding "I have assessed that Fury's strengths, consistent with Fury's higher rating, were more significant as compared to Thalin's." (AR 3286). Such language indicates the SSA conducted her own analysis of each proposal, thereby avoiding the SSEB's documentation deficiencies under Subfactor 2. The Court finds that the SSA exercised independent judgment for Factor 2 and Subfactor 2 and did not rely on the SSEB's "irrational ratings."

Further, Thalin has not established that the SSA assigned a "factually incorrect" weakness to Thalin's staffing approach under Subfactor 2. (Pl.'s MJAR at 33–34) The SSA determined Thalin's proposal did not provide sufficient information on retaining current employees indicating a high risk of employee turnover. (AR 3286). Thalin argues this finding contradicts its strengths that include "recruiting and hiring actions[,]" "cross-training[,]" telework options, and "Home-Grown Strategy," all of which could help current employees' career advancement. (Pl.'s MJAR at 33 (citing AR 3153)). However, this argument is unavailing. The SSA specified that "Thalin did not clearly address their approach to retaining current employees and this omission increases the risk associated with filling vacancies within [thirty] days after award and indicates an increased potential for higher turnover." (AR 3286). This weakness does not contradict Thalin's strengths. Rather, it shows that although Thalin addressed current employees' long-term careers, it did not account for more immediate employee retention. The SSA's finding also disproves Thalin's argument that the SSA improperly relied on the SSEB's flawed evaluations because it identified an additional weakness, (Pl.'s MJAR at 36–37), thereby demonstrating independent analysis.

Finally, the SSA properly considered both Thalin and Fury's proposals to make the source selection decision. As stated above, the Court will not second guess the discretionary determinations of procurement officials during "minutiae of the procurement process[.]" *E.W. Bliss Co.*, 77 F.3d at 449. It is the Court's role to determine whether the procurement was "legally permissible, reasonable, and supported by the facts." *UnitedHealth Mil. & Veterans Servs., LLC*, 132 Fed. Cl. at 551. The Court cannot substitute its own judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Here, the SSA analyzed both proposals and even engaged in a one-to-one comparison of Thalin and Fury's past performances and staffing approaches under Factor 2 and Subfactor 2, respectively, to determine Fury provided the best value to the Air Force. (AR 3286). Accordingly, the SSA's source selection decision was rational, well-documented, and in accordance with the law.

D. *Thalin failed to satisfy the requirements for injunctive relief.*

Thalin seeks a permanent injunction to permanently stop Fury's performance of the contract and require the Air Force to reevaluate offerors' proposals. (Pl.'s MJAR at 37–39). However, granting a permanent injunction is considered an "extraordinary remedy[.]" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Such relief requires the plaintiff to succeed on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (To issue permanent injunction, the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.). As explained above, Thalin fails on the merits. Therefore, Court is unable to award injunctive relief and need not analyze the remaining three factors. *Id.*

### III.   Conclusion

Accordingly, the Court **DENIES** Thalin's Motion for Judgment on the Administrative Record, (ECF No. 34), and **GRANTS** the United States' and Fury Solutions' Cross-Motions for Judgment on the Administrative Record, (ECF Nos. 35, 36).

The parties shall meet and confer and file a joint status report proposing redactions to this memorandum opinion by **June 7, 2023**, to allow the Court to file a public version of the opinion.

The Clerk is **DIRECTED** to enter judgment for Defendants. Each party shall bear their own costs.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge